UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UP STATE TOWER CO., LLC and
BUFFALO-LAKE ERIE WIRELESS
SYSTEMS CO., LLC,

                Plaintiffs,

      v.

THE TOWN OF SOUTHPORT, NEW YORK,
THE ZONING BOARD OF APPEALS OF
THE TOWN OF SOUTHPORT, NEW YORK,
and THE PLANNING BOARD OF THE
TOWN OF SOUTHPORT, NEW YORK,

                Defendants.

_____

UNITED STATES DISTRICT COURT
FILED
SEP 2 5 2019
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

**DECISION AND ORDER**

6:18-CV-06445 EAW

## INTRODUCTION

Plaintiffs Up State Tower Co., LLC ("Up State") and Buffalo Lake Erie Wireless Systems Co., LLC ("Buffalo Wireless") (collectively "Plaintiffs") bring this action pursuant to the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified at 47 U.S.C. § 151 *et seq.*, as amended) ("TCA"), the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Articles 30 and 78 of the New York Civil Practice Laws and Rules ("CPLR"), against defendants the Town of Southport, New York ("Southport"), the Zoning Board of Appeals of the Town of Southport, New York ("ZBA"), and the Planning Board of the Town of Southport, New York (the "Planning Board") (collectively "Defendants"). Plaintiffs allege Defendants unlawfully denied their application for a site plan approval and area variance to erect a wireless telecommunications tower. (Dkt. 1).

- 1 -

Presently before the Court is the motion for summary judgment brought by Defendants pursuant to Federal Rule of Civil Procedure 56. (Dkt. 22). For the following reasons, Defendants' motion is granted in part and denied in part. Specifically, the Court grants summary judgment in favor of Plaintiffs as to the declaratory judgment claim that certain provisions of Southport's Town Zoning Law are unlawful under New York State law, denies without prejudice the summary judgment motion as directed to Plaintiffs' claim that the fees charged and the provisions of the Town Zoning Law allowing for those charges effectively prohibited service in violation of the TCA, and otherwise grants summary judgment in favor of Defendants on the remaining claims.

## BACKGROUND

The following facts are drawn from Defendants' Statement of Material Facts (Dkt. 22-6) ("Defendants' Statement"), Plaintiffs' Response to Defendants' Statement of Undisputed Facts (Dkt. 26-10) ("Plaintiffs' Statement"), and the underlying Administrative Record (Dkt. 6).

On December 12, 2017, Plaintiffs submitted an application (the "Application") to construct a telecommunications tower (the "Tower") within Southport at the easterly terminus of Morley Place on property further identified as tax parcel number 109.07-5-45. (Dkt. 22-6 at ¶¶ 1-2). Plaintiffs submitted 18 copies of the Application. (Dkt. 26-10). On December 26, 2017, Defendants contacted Plaintiffs to ask where to send the special counsel bills generated from processing the Application, and Plaintiffs provided a billing address. (Dkt. 6-3 at 2).

The Application described the proposed project as a 160-foot "self-support telecommunications facility" that would be "surrounded by a fenced compound" and setback 47.59 feet from the western property line and 18.5 feet from the eastern property line. (*Id.* at ¶¶ 4, 8). The plans submitted with the Application also included a five-foot lightning rod (Dkt. 26-10 at ¶ 6), making the total height of the Tower 165 feet (Dkt. 22-6 at ¶ 6). Town of Southport Zoning Law ("Town Zoning Law") § 525-109(D) allows a maximum structure height of 120 feet and requires a setback of "[t]he tower height plus 1/2 the diameter" of an antenna installed above the tower. (*Id.* at ¶ 5 (alteration in original)). Thus, the Tower required a height and setback variance under the Town Zoning Law. (*Id.* at ¶¶ 7-8).

On January 2, 2018, the Planning Board held a meeting where Defendants requested that Plaintiffs clarify the height of the tower due to the discrepancy between the Application and the plans submitted with it, and Plaintiffs informed Defendants that the total height would be 165 feet.[1] (Dkt. 6-1 at 107; Dkt. 22-6 at ¶ 9; Dkt. 26-10 at ¶ 9). During the week of January 1, 2018, Defendants requested seven additional copies of the Application. (Dkt. 22-6 at ¶ 3). Plaintiffs submitted the additional copies on January 9, 2018. (*Id.*). The ZBA then held a meeting on January 17, 2018, where it advised Plaintiffs to provide additional information before the next month's meeting, including an assessment of alternative

---

[1]    Defendants assert that they also advised Plaintiffs to submit an application accurately stating the height of the tower. (Dkt. 22-6 at ¶ 11). The Board meeting minutes for January 17, 2018, include a request for "materials" from Plaintiffs about the height of the tower showing the correct height. (Dkt. 6-1 at 107). Plaintiffs deny they were asked to submit another application. (Dkt. 26-10 at ¶ 11).

locations, evidence that Plaintiffs made attempts to co-locate on an existing tower, and reasons that co-location on different towers was not feasible. (Dkt. 22-6 at ¶ 10). Plaintiffs stated they would provide the information as soon as possible, but that they could not provide it before the February 5, 2018, Planning Board meeting. (*Id.* at ¶¶ 12, 14).

At the February 5, 2018, meeting, Plaintiffs requested that the Planning Board declare itself the lead agency under the State Environmental Quality Review Act ("SEQRA") and that Defendants adjourn discussion of the Application to a different date. (Dkt. 6-3 at 13). The Planning Board declared itself as the lead SEQRA agency. (Dkt. 22-6 at ¶ 15). The next day, because of the time it was taking for Plaintiffs to respond to the document requests, Defendants asked Plaintiffs whether they would consider extending the Shot Clock.[2] (*Id.* at ¶ 16). The Shot Clock was set to expire on May 11, 2018. (Dkt. 22-6 at ¶ 38). Plaintiffs declined, stating that they wanted to "wait a month or so and see where things stand after the public hearing" (*id.* at ¶ 17), and requested that a joint public hearing of the ZBA and the Planning Board not be held until at least March 12, 2018 (*id.* at ¶ 18). A joint public hearing was scheduled for March 21, 2018. (*Id.* at ¶ 23).

On February 14, 2018, Defendants emailed Plaintiffs the "Special Consultant Fees Escrow Agreement" and requested that Plaintiffs withdraw the Application as incomplete and resubmit it. (Dkt. 6-3 at 26; Dkt. 22-6 at ¶¶ 19-20). The next day, Plaintiffs emailed Defendants to assert that because Defendants failed to inform Plaintiffs in writing within

---

[2]     "Shot clocks" are timeframes established by the Federal Communications Commission within which state and local governments must complete reviews of wireless infrastructure projects.

30 days of the Plan's submission that the Application was incomplete, the Shot Clock rules required that the Application be deemed complete. (Dkt. 6-3 at 28; Dkt. 26-10 at ¶ 20). Plaintiffs also requested itemized copies of Defendants' invoices to date and a copy of any scope of work and fee schedule submitted by the Town's retained radiofrequency engineer. (Dkt. 6-3 at 28). Defendants responded on February 15, 2018, again requesting that Plaintiffs toll the Shot Clock, and sending the engineer's proposal. (*Id.* at 30).

Also on February 15, 2018, the County Planning Board resolved that: (1) Southport should discuss the visual impacts of the Tower with Plaintiffs and request it be as visually unobtrusive as possible; (2) Plaintiffs should submit a decommissioning plan; (3) Plaintiffs should use the appropriate radiofrequency threshold for the general public; and (4) Plaintiffs should provide data showing that co-location on an existing tower is not an option. (Dkt. 22-6 at ¶ 21).

On February 16, 2018, Defendants sent Plaintiffs the proposal from their visual impacts expert and their town counsel's January invoice. (Dkt 6-3 at 37, 45). Three days later, Defendants requested a list of items to be provided "with sufficient time" for Defendants' experts to review before the March 21, 2018, meeting. (*Id.* at 55). On February 27, 2018, March 5, 2018, and March 6, 2018, Defendants followed up with Plaintiffs regarding the proposed escrow agreements and the funds to be deposited. (*Id.* at 71-73). Defendants also requested that Plaintiffs produce the supplemental documents by March 12, 2018. (*Id.* at 73). Plaintiffs informed Defendants that they had "significant concerns with respect to the current and anticipated fees for this project." (*Id.* at 74).

On March 7, 2018, Plaintiffs asked for leave to submit soft copies of the escrow agreement and requested documents on March 12, 2018, and hard copies the next day, and Defendants agreed. (*Id.* at ¶¶ 25-26). On March 12, 2018, Plaintiffs' counsel told Defendants that the documents would not be ready in time and that Plaintiffs would be willing to extend the Shot Clock if necessary. (*Id.* at ¶ 27; Dkt. 26-10 at ¶ 27). Defendants recommended that Plaintiffs withdraw the Application and resubmit it once they had prepared the documents. (Dkt. 22-6 at ¶ 28).

On March 17, 2018, Defendants advised Plaintiffs that if payment was not received for the legal fee invoices, then Defendants "will need to think about denying the [A]pplication due to failure to comply with SEQRA and collections proceedings." (Dkt. 6-3 at 101). Plaintiffs' counsel replied on March 20, 2018, to ask for unredacted copies of the invoices, which Defendants refused to do, claiming attorney-client privilege. (*Id.* at 103, 105). Instead, Defendants sent redacted invoices, edited to indicate whether the redactions were attorney-client communications or work product, and requested that Plaintiffs pay the January invoice immediately and the February invoice within 30 days. (*Id.* at 108). The January invoice totaled $12,892.18, and the February invoice totaled $11,943.00. (Dkt. 6-1 at 218, 221). On March 26, 2018, Plaintiffs' counsel informed Defendants that Plaintiffs had been advised of the invoices. (Dkt. 6-3 at 111).

On April 16, 2018, Plaintiffs emailed a letter to Defendants objecting to the legal fees and declining to enter into the escrow agreement sent by Defendants. (Dkt. 6-1 at 231-33; Dkt. 6-3 at 123). Defendants responded to Plaintiffs' counsel the same day, stating Southport was "willing to reduce the fees, rather than drag this out any further." (Dkt. 6-3

at 124). After the reduction, the fees for Defendants' attorney totaled $22,362.77. (Dkt. 6-1 at 222, 224, 227, 230).

On April 17, 2018, Defendants again asked about tolling the Shot Clock, and Plaintiffs sent a proposed agreement extending the shot clock to July 20, 2018. (Dkt. 6-3 at 131, 138). Defendants' counsel stated the agreement had been sent to her client, and then advised Plaintiffs that "the fee issue is not a factor delaying their [A]pplication's review. . . . The only money that [Southport] needs to continue its review is the escrow for the RF Engineer and Saratoga Associates." (*Id.* at 141). On April 19, 2018, Defendants informed Plaintiffs that they were willing to extend the Shot Clock to 60 days from when the Southport Town Clerk received the requested information. (*Id.* at 145). Plaintiffs did not reply, and Defendants followed up on April 25, 2018, as well as sent discounted versions of the invoices. (*Id.* at 146).

On May 11, 2018, the day of the Shot Clock's expiration, Plaintiffs sent Defendants an email at 5:05 p.m. purporting to contain a revised version of the Shot Clock agreement, but did not include an attachment. (Dkt. 6-3 at 150). Defendants informed Plaintiffs of the missing attachment at 5:31 p.m. (*Id.* at 151). On May 14, 2018, Plaintiffs re-sent the email with the proposed agreement attached (*id.* at 152), but Defendants informed Plaintiffs that because the Shot Clock had expired, they had "no choice but to deny the Application, with leave for [Plaintiffs] to resubmit once [they are] in a position to do so," (*id.* at 153).

The ZBA unanimously voted to deny the Application on May 16, 2018. (Dkt. 22-6 at ¶ 42). Plaintiffs did not find out about the denial until a June 4, 2018, Planning Board meeting, and on June 1, 2018, they submitted the requested supplemental materials, a

partially executed escrow agreement, and a check for $12,800.00 to the Planning Board. (*Id.* at ¶¶ 42, 44). The submission noted that the payment was made under protest. (Dkt. 6-2 at 1 n.1). At the June 4, 2018, meeting, the Planning Board unanimously voted to deny the Application without prejudice, giving Plaintiffs leave to resubmit an application. (Dkt. 22-6 at ¶¶ 43, 45).

Plaintiffs filed the instant lawsuit on June 15, 2018 (Dkt. 1), and Defendants answered on August 6, 2018 (Dkt. 6). On January 31, 2019, Defendants filed the motion for summary judgment presently before the Court. (Dkt. 22). Plaintiffs filed their response on March 8, 2019 (Dkt. 26), and Defendants replied on March 22, 2019 (Dkt. 27). On April 9, 2019, Plaintiffs filed a sur-reply. (Dkt. 29). The Court issued a text order on April 12, 2019, stating it would consider the sur-reply and granting Defendants leave to file a response to the sur-reply. (Dkt. 31). Defendants submitted their response on April 19, 2019. (Dkt. 32). Oral argument was held before the undersigned on July 30, 2019, and the Court reserved decision. (Dkt. 33). On August 13, 2019, Defendants filed supplemental briefing with the Court's permission (Dkt. 36), to which Plaintiffs filed a response on August 27, 2019 (Dkt. 37).

## DISCUSSION

### I.   Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in

the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.    Declaratory Judgment

Defendants move for summary judgment as to Plaintiffs' declaratory judgment claim. (Dkt. 22). Plaintiffs claim that Defendants have not acted within the scope of the legislative grant given to the Town by Article 16 of the New York Town Law, and that Plaintiffs are entitled to a declaratory judgment that certain provisions of the Town Zoning Law are unlawful and that Plaintiffs are therefore not liable to pay the fees charged by Defendants. (Dkt. 1 at 34-37). The Court agrees that there are no disputed issues of material fact related to this claim. However, those undisputed facts establish that judgment should be granted in favor of Plaintiffs. *See New Eng. Health Care Emp. Union, Dist. 1199, SEIU AFL-CIO v. Mount Sinai Hosp.*, 65 F.3d 1024, 1030 (2d Cir. 1995) ("[W]e may reverse the grant of summary judgment and order judgment for the non-moving party if we find undisputed support in the record entitling the non-moving party to judgment as a matter of law.").

"[A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).   When determining whether to entertain an action for declaratory judgment, the Second Circuit has "instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). Because Plaintiffs ask the Court to determine whether the provisions of the Town Zoning Law related to fees comply with

New York State law, and such a determination will offer Plaintiffs relief from the uncertainty of whether they are legally obligated to pay the fees demanded by Defendants, this standard is satisfied.

Article IX of the New York State Constitution allows local governments to act within the scope of authority granted to them by a legislative delegation of power, including to pass local legislation. N.Y. Const. art. IX, § 2(b). New York Municipal Home Rule § 10(1)(ii)(a)(9-a), enacted pursuant to that constitutional provision, gives state and local governments the authority to charge fees. *See* N.Y. Mun Home Rule § 10(1)(ii)(a)(9-a) ("[E]very local government, as provided in this chapter, shall have power to adopt and amend local laws . . . relating to . . . [t]he fixing, levy, collection and administration of local government . . . fees."). "[T]he Legislature's mandate carries with it an implied limited delegation of power to the local government to enact ordinances necessary to carry out the legislative plan." *Jewish Reconstructionist Synagogue of N. Shore v. Inc. Vill. of Roslyn Harbor*, 40 N.Y.2d 158, 162-63 (1976). Municipal ordinances are entitled to an "exceedingly strong presumption of constitutionality," and "unconstitutionality must be demonstrated beyond a reasonable doubt." *Lighthouse Shores v. Town of Islip*, 41 N.Y.2d 7, 11 (1976).

"[A] town is vested with implied powers to impose a permit fee based upon its actual engineering and legal costs, so long as the expenses to be reimbursed are reasonable in amount and necessary to the accomplishment of the town's regulatory and proprietary functions." *Home Builders Ass'n of Cent. N.Y. v. Town of Onondaga*, 267 A.D.2d 973, 974 (4th Dep't 1999); *see Synagogue*, 40 N.Y.2d at 163 ("[W]hen the power to enact fees

- 11 -

is to be implied, the limitation that the fees charged must be reasonably necessary to the accomplishment of the statutory command must also be implied."). "'[F]ees charged . . . [should] be reasonably necessary to the accomplishment of the statutory command,' and the fees 'should be assessed or estimated on the basis of reliable factual studies or statistics.'" *MetroPCS N.Y., LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 425 (S.D.N.Y. 2010) (quoting *Synagogue*, 40 N.Y.2d at 163). "Without the safeguard of a requirement that fees bear a relation to average costs, a board would be free to incur, in the individual case, not only necessary costs but also any which it, in its untrammeled discretion, might think desirable or convenient[.]" *Synagogue*, 40 N.Y.2d at 163.

New York courts strike down as unlawful ordinances that do not have "standards which lend assurance that [the fees] are not unreasonable, discriminatory nor oppressive." *Id.* at 164 (quotation omitted) (striking down ordinance that provided the applicant for a variance or special use permit had to "pay the actual costs incurred by the board in passing on the matter"); *see City of Mount Vernon*, 739 F. Supp. 2d at 424, 426 (striking down ordinance that required applicant "to reimburse the City for all reasonable costs of consultant and expert evaluation and consultation to the City in connection with the review of any application" because there was "no codified limit to the consulting fees that can be assessed over the course of the application process and the City has not presented any explanation for the relatively high application fee"); *Landstein v. Town of LaGrange*, 166 A.D.3d 100, 109-10 (2d Dep't 2018) (striking down ordinance that defined "necessary" as including "expenses charged by an attorney for services rendered in order to assist" with various general tasks, and expenses charged "to promote such other interests that the Town

may specify as relevant," finding the language was an "open-ended invitation to use the assistance of counsel to advance any interest deemed to be relevant" (quotation omitted)); *Cimato Bros., Inc. v. Town of Pendleton*, 270 A.D.2d 879, 879-80 (4th Dep't 2000) (declaring unconstitutional under New York law ordinance that did "not limit the nature or extent of services that the Town Engineer might perform in every instance nor does it set forth any guidelines regarding the charges for such services"). By contrast, one New York court has upheld an ordinance that mandated reimbursement of the town for engineering and legal expenses, finding that several provisions, including a provision "that engineering and legal fees are to be audited by the Town Supervisor," ensured that "the required reimbursement is neither open-ended nor unlimited." *Home Builders Association*, 267 A.D.2d at 974 (quotation omitted).

In view of this legal authority, the Court finds the provisions of the Town Zoning Law at issue violate New York law. The parties have brought three different provisions of the Town Zoning Law to the Court's attention—§§ 525-50, 525-65, and 525-143(B)(2). Town Zoning Law § 525-50[3] provides:

> The Planning Board may require an applicant for any review, permit or approval to deposit in escrow a reasonable amount established by the Planning Board to pay for the fees and/or costs of any engineer, consultant or attorney designated by the Planning Board to review such application. The fees and/or costs charged by such engineer, consultant or attorney in connection with such review will be charged against the sum deposited in escrow. Any amount remaining shall be returned to the applicant within 45 days of final action on the application.

---

[3] Zoning Law § 525-50 addresses consultant review fees in connection with permits for planned development districts. Because the location of the tower is "in the Industrial District" of Southport (Dkt. 6-1 at 56), the provision may not apply here. However, as neither party disputes the applicability of § 525-50, the Court includes it in its analysis.

Similar to the ordinance at issue in *City of Mount Vernon*, 739 F. Supp. 2d 409, Town

Zoning Law § 525-50 includes a "reasonable" limitation, but it does not limit the fees to

those that are "necessary." Nor does the ordinance contain a codified limit such as an audit

procedure or guidance as to what fees can be charged, leaving the fees subject only to the

"unfettered discretion" of the Planning Board. *See id.* at 426; *Cimato Bros., Inc.*, 270

A.D.2d at 879.

> Town Zoning Law § 525-65 also presents similar problems. The provision states:

> The Planning Board, subject to the approval of the Town Board, may require
> an applicant for site plan review to deposit in an escrow account a reasonable
> amount established by the Planning Board to pay the fees and/or costs of any
> consultant, engineer, or attorney designated by the Town Board to review the
> application. The fees and/or costs charged by such consultant, engineer, or
> attorney in connection with such review will be charged against the sum
> deposited in escrow. If specific circumstances warrant it, additional funds
> will be required to be deposited in order to cover reasonable expenses
> incurred beyond the original estimate. . . . The deposit specified above does
> not include . . . fees charged by Town departments or boards for permits,
> approvals, hearings, or other actions, except as noted above.

Like § 525-50, § 525-65 fails to include any language limiting fees to those "necessary"

and only speaks to fees that the Planning Board finds "reasonable." Although § 525-65

includes the additional limitation that the Town Board must approve the Planning Board's

decision to require reimbursement for the fees and costs associated with a site plan review

application, it contains no guidance as to the factors the Town Board must consider when

approving the decision or any indication that the Town Board must actually examine the

fees at issue. To the contrary, the record before the Court contains no evidence the Town

Board reviewed the consultant or attorneys' fees[4] prior to approving them. Accordingly, § 525-65 does not provide the same limitation as the ordinance at issue in *Home Builders Association*, 267 A.D.2d 973, *i.e.*, an audit of the fees to be reimbursed, or other specific limiting standards.

The final provision at issue, § 525-143(B)(2), also violates New York law. Section 525-143(B)(2) states: "The applicant shall be responsible for the review incurred by the Town for professional engineers, planners, architects or attorneys during the subdivision, site plan or permit application review process." This provision contains *no* limitation, either reasonable or necessary, and is precisely the type of zoning law that *Synagogue* criticized.

Defendants argue that the costs they charged Plaintiffs are standard. Defendants' counsel states in her affidavit that she has represented other towns in similar matters, and "[t]he costs and fees associated with Plaintiffs' [A]pplication, including the attorneys' fees, were . . . typical for developments such as Plaintiffs." (Dkt. 22-4 at ¶ 19). However, Plaintiffs dispute the reasonableness of the fees (*see, e.g.*, Dkt. 26-2 at ¶ 12), and regardless,

---

[4]     Defendants also argue that Plaintiffs have mostly taken issue with the attorneys' fees charged, and that Plaintiffs "do not seriously contend that the consultants' fees were unreasonable." (Dkt. 36 at 10). However, the record shows Defendants dispute the reasonableness of the consultants' fees in addition to the attorneys' fees. In the Complaint, Plaintiffs allege that "the ordinance sets no limit to the consultant's/attorney's fee." (Dkt. 1 at ¶ 198). Additionally, on April 13, 2018, Plaintiffs sent a letter to Defendants declining to enter into an escrow agreement for professional fees that discussed the unreasonableness of the fees of the two consultants "[w]hen combined with the Town Counsel's fees." (Dkt. 6-1 at 231). Moreover, on June 1, 2018, Plaintiffs submitted a check for $12,800.00 to the Planning Board to pay for the outstanding consultants' fees, but explicitly noted that "the payment is being made **under protest**." (Dkt. 6-2 at 1, 5).

"the Court is more troubled by the absence of any guiding standard or limitation on how much the applicant can be charged rather than the actual amount charged in prior application processes," *City of Mount Vernon*, 739 F. Supp. 2d at 426.

Defendants contend that a fee provision need not "recite the word 'necessary'" to be permissible. (Dkt. 36 at 6). Defendants cite to *Matter of Walton v. New York State Department of Correctional Services*, 13 N.Y.3d 475 (2009), where the Court of Appeals discussed that "fees must bear at least a rough correlation to the expense to which the State is put in administering its licensing procedures or to the benefits those who make the payments receive," *id.* at 485, as well as to *Synagogue*'s holding that fees should "bear a relation to average costs," 40 N.Y.2d at 163. Defendants also contend *Landstein*, 166 A.D.3d 100, supports the position that New York law does not require use of the word "necessary" in a fee provision because the *Landstein* court found an ordinance that used the word "necessary" was illegal. (Dkt. 36 at 6); *see Landstein*, 166 A.D.3d at 109-12.

The Court agrees that New York law does not require the use of a particular word like "necessary" in a fee provision to make the provision lawful. The court's holding in *Landstein* demonstrates how including the word "necessary" may even be fatal to an ordinance when the ordinance's definition of "necessary" is unlawfully broad. *See Landstein*, 166 A.D.3d at 110. However, while a fee provision may not need to specifically include the word "necessary" to be lawful, *Synagogue* and the cases that followed it make clear that fee provisions must contain codified limitations ensuring any fees charged will "bear at least a rough correlation" to the reasonable expenses of the government entity demanding those fees. *Walton*, 13 N.Y.3d at 485; *see City of Mount Vernon*, 739 F. Supp.

2d 409; *Cimato Bros.*, 270 A.D.2d 879; *Home Builders Association*, 267 A.D.2d 973; *see also Landstein*, 166 A.D.3d 100. The "limitations" in the ordinances at issue here give the Planning Board not only the authority to demand fees but also the authority to deem those same fees reasonable without any other meaningful restrictions. In other words, the provisions of the Town Zoning Law do not limit Defendants to only charging fees that are reasonably necessary—rather, they allow Defendants unfettered discretion in determining the amount of fees and the realm of reasonableness. As a result, the provisions fail to satisfy the standard articulated in *Synagogue* and *Walton*.

Defendants contend that limiting the fees recoverable in the Town Zoning Laws to those incurred "to review the application" puts a lawful limit on the ordinances. (Dkt. 36 at 6). However, the language "to review the application" does not indicate that the fees imposed by the review would bear a relation to the *average* costs of reviewing an application as is required by New York law, only that the fees would bear a relation to the *particular* application being reviewed. The *City of Mount Vernon* court struck down a similar provision, which purported to limit fees to "all reasonable costs of consultant and expert evaluation . . . in connection with the review of any application," because it put "no limitation on the amount of funds needed." 739 F. Supp. 2d at 424, 426.

Defendants also argue that the sections of the Town Zoning Law at issue do not violate New York law because they should be interpreted so as to comply with New York law. (Dkt. 36 at 8). The Court is not persuaded by that argument in this context. Defendants cite to cases holding that when a statute is ambiguous, and one interpretation of that statute would change a long-standing legal precedent, there is a presumption that

such an interpretation is not the one the state legislature intended. *See Feder v. Caluguira*, 8 N.Y.2d 400, 404 (1960) ("It is a fair deduction that the Legislature did not intend a meaning for the term 'lease' in section 399 different from that already given it by the courts."); *Buduson v. Curtis*, 285 A.D. 517, 520 (4th Dep't 1955), *aff'd*, 309 N.Y. 879 (1955) ("When the legislature amends or considers afresh a statute it will be assumed to have knowledge of judicial decisions interpreting the statute as then existing and if it deals with it in a manner which does not rebut or overthrow the judicial interpretation it will be regarded as having legislated in the light of and as having accepted such interpretation." (quotation omitted)). However, the instant matter is not a case where the parties dispute the correct interpretation of the existing language in a law. Rather, the ordinances before the Court have entirely omitted the provisions required to make them lawful. Accordingly, the interpretive canon cited by Defendants has no applicability in the instant matter. Moreover, the decisions discussed above where similar ordinances were struck down support the propriety of doing so here.

Although Plaintiffs did not move for summary judgment, the Court finds the undisputed facts in the record establish that summary judgment should be granted in Plaintiffs' favor as to the declaratory judgment claim. *See Mount Sinai Hosp.*, 65 F.3d at 1030. Accordingly, the Court denies Defendants' summary judgment motion as to the declaratory judgment claim, and grants summary judgment in favor of Plaintiffs.

## III.    TCA Claims

In 1996, Congress enacted the TCA "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of

advanced telecommunications and information technologies and services." H.R. Conf. Rep. No. 104-458, at 113 (1996). To accomplish this end, the TCA subjects to judicial oversight decisions by state and local governments to deny sitings of wireless facilities. 47 U.S.C. § 332(c)(7)(B)(v). "[D]enials subject to the TCA are reviewed by this court more closely than are other types of zoning decisions to which federal courts generally accord great deference." *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 637 (2d Cir. 1999) (quotation omitted).

Defendants move for summary judgment as to all of the claims brought by Plaintiffs pursuant to the TCA. Plaintiffs claim: (1) Defendants failed to issue written notices of denial supported by substantial evidence in violation of 47 U.S.C. § 332(C)(7)(B)(iii); (2) Defendants' denial of their Application imposes an unlawful prohibition of the provision of wireless services in violation of 47 U.S.C. § 332(C)(7)(B)(i)(II); (3) sections of the Town Zoning Law impose an unlawful prohibition of the provision of wireless services in violation of 47 U.S.C. § 332(C)(7)(B)(i)(II); and (4) the fees imposed by Defendants constitute an unlawful prohibition of the provision of wireless services in violation of 47 U.S.C. § 332(C)(7)(B)(i)(II). The Court addresses each claim below.

A.   **"Substantial Evidence" Claim**

Plaintiffs argue that the final decision issued by Defendants was not supported by substantial evidence. The Court finds that a reasonable trier of fact could only determine that it was.

The TCA provides: "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). "In determining whether the denial was supported by substantial evidence, we must employ 'the traditional standard used for judicial review of agency actions.'" *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999) (quoting H.R. Conf. No. 104-458, at 208 (1996)). "Substantial evidence requires evaluation of the entire record, including opposing evidence, and requires a decision to be supported by less than a preponderance but more than a scintilla of evidence." *Willoth*, 176 F.3d at 638 (quotation and citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cellular Telephone Co.*, 166 F.3d at 494 (quoting *Universal Camera v. NLRB*, 340 U.S. 474, 477 (1951)). "This standard of review is deferential, and courts may neither engage in their own fact-finding nor supplant the Town Board's reasonable determinations." *Nextel Partners of Upstate N.Y., Inc. v. Town of Canaan*, 62 F. Supp. 2d 691, 695 (N.D.N.Y. 1999) (citing *Cellular Telephone Co.*, 166 F.3d at 494). "If the Court finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed." *T-Mobile Ne. LLC v. Town of Islip*, 893 F. Supp. 2d 338, 355 (E.D.N.Y. 2012).

"[W]hile the TCA governs the 'procedural requirements that local boards must comply with in evaluating cell site applications' the applicable substantive standards are the 'established principles of state and local law.'" *Id.* at 354 (quoting *Cellular Telephone*

*Co.*, 166 F.3d at 494. In other words, when a court evaluates whether a reason for denial was supported by substantial evidence under the TCA, "local and state zoning laws govern the weight to be given the evidence." *Cellular Telephone Co.*, 166 F.3d at 494.

In New York, wireless providers are considered public utilities for the purposes of zoning applications, *see Cellular Telephone Co. v. Rosenberg*, 82 N.Y.2d 364, 371 (1993), and consequently their applications are reviewed under the "public necessity" standard, *Consol. Edison Co. of N.Y., Inc. v. Hoffman*, 43 N.Y.2d 598, 610 (1978); *see N.Y. SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trustees*, 812 F. Supp. 2d 143, 164 (E.D.N.Y. 2011) ("[T]he applicable standard on a substantial evidence claim is the public necessity standard under New York law 'which concerns the showing that a utility must make under New York law before a zoning board *may* grant a use variance.'" (quoting *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 535 (2d Cir. 2005))).

Under the public necessity standard, the carrier has the burden of establishing: "[1] that there are gaps in service, [2] that the location of the proposed facility will remedy those gaps and [3] that the facility presents a minimal intrusion on the community." *Site Acquisitions, Inc. v. Town of New Scotland*, 2 A.D.3d 1135, 1137 (3d Dep't 2003); *see Rosenberg*, 82 N.Y.2d at 373-74 (holding the zoning board abused its discretion in denying the variance because the telecommunications company established "that the proposed installation would have a negligible impact on the surrounding neighborhood" and that it would "enable it to remedy gaps in its service area that currently prevent it from providing adequate service to its customers"). "To establish public necessity, the carrier must demonstrate not that the proposed facility was the 'least intrusive means,' but rather that

the proposed facility was '*more feasible* than other options.'"[5] *Vill. of Floral Park*, 812 F. Supp. 2d at 164 (quoting *Omnipoint,* 430 F.3d at 535 (emphasis added)); *see Omnipoint,* 430 F.3d at 535 ("[T]o establish necessity, [the carrier] had to demonstrate that there was a gap in cell service, and that building the proposed tower at the . . . site was more feasible than other options.").

Defendants do not dispute that there was a gap in service or that the location of Plaintiffs' proposed facility would remedy that gap. Instead, Defendants denied the Application on the grounds that Plaintiffs failed to provide the requested supplemental alternative location information and because the Shot Clock had expired. (Dkt. 6-1 at 165). The Court addresses each of these grounds in turn.

### 1. **Supplemental Materials**

Plaintiffs argue that Defendants' denial of the Application was not based on substantial evidence because the Application initially provided by Plaintiffs was sufficient and the supplemental information Defendants requested was arbitrary. (Dkt. 26-9 at 21).

---

[5] Defendants contest the applicability of the "more feasible than other options" standard here, contending that "[b]ecause Plaintiffs are arguing that Defendants must approve their application, the standard applicable to the present case is the "least intrusive means standard." (Dkt. 27 at 6). It is true that the "least intrusive means standard" is applicable to Plaintiffs' case because that is the standard used for effective prohibition claims brought pursuant to § 332(c)(7)(B)(i)(II), and Plaintiffs have brought several claims pursuant to that provision, as discussed later in this Decision and Order. However, Plaintiffs have also brought substantial evidence claims pursuant to § 332(c)(7)(B)(iii), and the "more feasible than other options" standard applies to those claims. *See Up State Tower Co., LLC v. Town of Kiantone, N.Y.*, No. 1:16-cv-00069-MAT, 2019 WL 1117220, at *6 (W.D.N.Y. Mar. 11, 2019) (finding the public necessity test applies to substantial evidence claims, and "[a]s part of the public necessity test, a zoning board must consider whether there is a more feasible, less intrusive option for the wireless provider to site its facility") (collecting cases).

For the reasons that follow, the Court finds a reasonable trier of fact could only determine Defendants' denial of the Application due to the lack of supplemental information was based on substantial evidence.

As a preliminary matter, Defendants satisfied their obligation to provide written reasoning for the denial of the Application. "Congress . . . permitted localities to comply with their obligation to give written reasons so long as the locality's reasons are stated clearly enough to enable judicial review." *T-Mobile South, LLC v. City of Roswell, Ga.*, 135 S. Ct. 808, 818 (2015). The ZBA articulated the reasons for the Application's denial in a resolution issued on May 18, 2018, stating: "The Town has not received information requested and therefore declines the application for lack of supporting documentation requested at a previous meeting[.]" (Dkt. 6-1 at 165). The resolution and the ZBA meeting minutes from January 17, 2018, that detail the supplemental materials requested (*id.* at 143) are stated clearly enough to allow judicial review by the Court. *See id.* (discussing that the TCA "does not require a locality to provide its written reasons in any particular format").

Plaintiffs' Application explained where the service gap was, that it used a quarter-mile search area "within which a new cell site, if installed at an appropriate height, is likely to provide reliable service to the surrounding areas," and why it ultimately selected the site in the Application. (Dkt. 6-1 at 54-56). The reason given for selecting the site was the site's location—it is in the Industrial District, outside of the FEMA floodplain, and behind trees that would partially screen it. (*Id.* at 56). The Application also gave a brief explanation about three alternative sites and why they were insufficient for Plaintiffs' tower. (Dkt. 6-1 at 57). For the first alternative site, Plaintiffs left contact information

with the owner but did not hear back; for the second site, Plaintiffs also left contact information with the owner as well as a voicemail, but did not hear back; and for the third site, Plaintiffs spoke with the owner who was not interested due to a pending expansion project. (*Id.*). The Application states Plaintiffs also looked into co-locating on existing telecommunications towers but that there were none in the quarter-mile search area. It noted that at least one tower was nearby, a 70-foot tower mounted on the roof of the Southport Fire Department, but it was not tall enough to fill the coverage gap. (*Id.* at 57, 143). A map or explanation of what the range would be from the 70-foot tower, or any other existing tower, was not provided with the Application.

Upon reviewing the Application, the record before the Court shows the ZBA requested more information about the possibility of Plaintiffs co-locating on cell towers already existing in the vicinity. (*Id.* at 143). The ZBA requested Plaintiffs provide it with the following information: more alternative locations, an explanation of why Plaintiffs want to locate the tower near State Route 14, and evidence Plaintiffs made attempts to co-locate that were denied. (*Id.*). Plaintiffs agreed to submit the requested documents (*see* Dkt. 6-3 at 8 (e-mail from Plaintiffs' counsel to Defendants' counsel stating: "Our client is still preparing documents in response to comments received from the [Planning Board] and ZBA.")), but failed to do so until June 1, 2018, three weeks after the Shot Clock expired (Dkt. 22-6 at ¶ 46).

*Omnipoint*, 430 F.3d 529, is instructive. The plaintiff in *Omnipoint* "identified several other potential sites but stated in conclusory fashion that they were unfeasible." *Id.* at 536. The Second Circuit found "the record is clear that other cell companies serve the

area in which [the plaintiff] has its gap. From this, the Board could infer that other towers erected by other companies are in the vicinity[.]" *Id.* Accordingly, the plaintiff "had the burden of showing either that those towers lacked capacity for [the plaintiff's] facility or that (for some other reason) those towers were unavailable to bridge [the plaintiff]'s coverage gap." *Id.*

A reasonable trier of fact could only find on the record before the Court that Defendants had substantial evidence to support their denial of the Application based on Plaintiffs' failure to submit supplemental materials. The record shows that, like the *Omnipoint* plaintiff, Plaintiffs only made a conclusory statement in the Application that co-locating was not feasible, without giving the ZBA any data showing the difference in coverage, and only briefly mentioning one tower when others were also inferably within the vicinity. (Dkt. 6-1 at 57). Moreover, the record does not show, nor do Plaintiffs contend, that Plaintiffs objected to providing the requested supplemental information. To the contrary, Plaintiffs agreed to submit the supplemental documents. Additionally, another entity, the County Planning Board, upon reviewing the Application stated that Plaintiffs should provide data showing that co-location on an existing tower is not an option. (Dkt. 22-6 at ¶ 21). The Court finds that the ZBA was "justified in considering the availability of alternatives that might create less disruption to the community's zoning plan." *N.Y. SMSA Ltd. P'ship v. Inc. Vill. of Mineola*, No. 01-CV-8211 (JS)(WDW), 2003 WL 25787525, at *9 (E.D.N.Y. Mar. 26, 2003).

Plaintiffs contend that in light of a recent decision involving plaintiff Up State from this District, *Up State Tower Co., LLC v. Town of Kiantone, N.Y.*, 2019 WL 1117220, the

Court should deny Defendants' summary judgment motion as to the substantial evidence claim. (Dkt. 29). In *Kiantone*, the Court held "the Board's rejection of Plaintiff's application for failing to investigate alternative sites or follow the Board's recommendations was not supported by substantial evidence." *Id.* at *7. The initial application submitted by Up State evaluated nine commercial properties. *Id.* at *6. Up State was then asked to evaluate additional properties outside of its initial search ring, a request Up State complied with by evaluating 10 more properties, including three sites that were not commercially zoned. *Id.* at *7. The *Kiantone* court noted that "Plaintiff explained in detail its rationale for declining to assess" other properties, but that the town planning board denied the application and recommended that Up State "explore options that would be less intrusive, even if the site was not located in a Business Zoning District." *Id.*

The instant matter differs from *Kiantone* in several key respects. In their initial Application, Plaintiffs evaluated only three properties, not nine. More importantly, unlike in *Kiantone* where Up State complied with the town's request to submit supplemental materials, Plaintiffs in the instant matter did not do so before Defendants' opportunity to review the Application expired. Finally, in *Kiantone* the court questioned the reasonableness of the planning board's "demand that Plaintiff explore locations where the placement of wireless facilities is expressly forbidden by the Town's zoning law." 2019 WL 1117220, at *7. In contrast, here, Defendants asked Plaintiffs to investigate locating on towers that were already approved and constructed. Accordingly, the Court finds the reasoning in *Kiantone* does not apply to Plaintiffs' claims.

Plaintiffs also contend that summary judgment should not be granted because Defendants have not presented any evidence of less intrusive, feasible alternatives. (Dkt. 29 at 4). Although some courts, in making the substantial evidence determination, have considered whether the local government presented evidence that other sites were appropriate substitutes, these courts have only done so after finding that the applicant met its burden of investigating alternatives. *See City of Mount Vernon*, 739 F. Supp. 2d at 420 ("The administrative record shows that the City . . . denied [the plaintiff]'s applications exclusively because [the plaintiff] refused to provide information about the viability of expanding the . . . network to fill its coverage gap. There were other concerns that the propagation plots provided by [the plaintiff] did not fully demonstrate the need for a wireless facility in [the city]. . . . However, [the plaintiff] eventually provided the information the City requested. . . . [The board] did not offer any evidence to contradict [the plaintiff]'s submissions."); *N.Y. SMSA L.P. v. Town of Oyster Bay Zoning Bd. of Appeals*, No. 08–CV–4833, 2010 WL 3937277, at *6 (E.D.N.Y. Sept. 30, 2010) (holding the substantial evidence provision was violated because "[t]he Board presented *no evidence* that other sites were appropriate substitutes for the Property," and the carrier met its burden of investigating alternatives and presented good-faith justifications regarding the infeasibility of the alternative sites); *N.Y. SMSA*, 2003 WL 25787525, at *9 ("[The plaintiff] met its burden of investigating alternatives and presented credible evidence regarding the infeasibility of the sites and the Board presented no evidence to the contrary.").

In the instant matter, Plaintiffs never met their burden of investigating alternatives. *See Town of Canaan*, 62 F. Supp. 2d at 696 ("The Court concludes that the [defendant's expert] report provides substantial evidence supporting the Town's decision. The report requests that [the plaintiff] investigate altering voltage flow as an alternative to building the . . . site, as well as a list of specific information requests to which [the plaintiff] had not responded."). Accordingly, Defendants' denial of the Application due to the absence of supplemental materials was supported by substantial evidence.

## 2. Shot Clock

Plaintiffs argue that even if the Application was initially deficient, the supplemental materials submitted on June 1, 2018, addressed those concerns, and Defendants should have granted the Application in light of those supplemental materials even though the Shot Clock had expired. (Dkt. 26-9 at 20-23). The Court finds Defendants had substantial evidence to deny the Application after the expiration of the Shot Clock.

The TCA provides:

> A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

47 U.S.C. § 332(c)(7)(B)(ii). The FCC interpreted the "reasonable period of time" language in the TCA to presumptively mean "90 days to process personal wireless service facility siting applications requesting collocations, and . . . 150 days to process all other applications." 24 F.C.C. Rcd. 13994, 14005 (2009). If the application is not processed within the prescribed time period, then the action is considered a "failure to act" and the

applicant can file a lawsuit. *Id.* However, "a 'reasonable period of time' may be extended beyond 90 or 150 days by mutual consent of the personal wireless service provider and the State or local government[.]" *Id.* at 14013. The Supreme Court has determined that this interpretation, commonly referred to as the "Shot Clock," is entitled to *Chevron* deference. *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 294-95, 307.

In the instant matter, Plaintiffs filed the Application on December 12, 2017, giving Defendants until May 11, 2018, to process the Application before the Shot Clock expired. The record shows that Defendants asked Plaintiffs to extend the Shot Clock twice in February, but that Plaintiffs wanted to wait and see how the application process progressed. (Dkt. 6-3 at 30; Dkt. 22-6 at ¶ 16). On April 17, 2018, Defendants again asked about tolling the Shot Clock, and Plaintiffs sent a proposed agreement extending the shot clock to July 20, 2018. (Dkt. 6-3 at 131, 138). On April 19, 2018, Defendants informed Plaintiffs that they were willing to extend the Shot Clock to 60 days from when the Southport Town Clerk received the requested information, and followed up with Plaintiffs on April 25, 2018. (*Id.* at 145-46). Plaintiffs did not reply. (*Id.*). On May 11, 2018, the day of the Shot Clock's expiration, Plaintiffs sent Defendants an email at 5:05 p.m. purporting to contain a revised version of the Shot Clock agreement, but did not include an attachment. (*Id.* at 150). Defendants informed Plaintiffs of the missing attachment at 5:31 p.m. (*Id.* at 151). On May 14, 2018, after expiration of the Shot Clock, Plaintiffs re-sent the email with the proposed agreement attached (*id.* at 152), but Defendants informed Plaintiffs that because the Shot Clock had expired, they were going to deny the Application but would allow Plaintiffs to resubmit it (*id.* at 153).

A reasonable trier of fact could only find on the record before the Court that Defendants had substantial evidence to deny the Application based on expiration of the Shot Clock. The deadline set by the FCC is clear, and Defendants cannot be faulted for Plaintiffs' procrastination. To the contrary, the undisputed evidence establishes that Defendants made every effort to work with Plaintiffs to extend the Shot Clock, contacting them at least three months before it was set to expire and inquiring about an extension no less than five times. Even when Plaintiffs sent an email after close-of-business, on a Friday, on the day the Shot Clock was set to expire, that purported to contain the extension agreement but had no attachment, Defendants attempted to contact Plaintiffs shortly thereafter to inform them of their error. However, they did not receive a response from Plaintiffs until the following Monday. The Court is not persuaded by Plaintiffs' attempt to saddle Defendants with liability for Plaintiffs' mistakes.

Plaintiffs contend that "the Shot Clock is intended to benefit an Applicant and the public in ensuring the timely determination of an Application" and that it "is not intended to be used as a sword by the government." (Dkt. 26-9 at 21-22). It is unclear why Plaintiffs characterize Defendants' denial as a "sword" in light of Defendants' clear statement that Plaintiffs are free to resubmit the Application. If anything, the Shot Clock has been used as a sword against Defendants, and a double-edged one at that: if Defendants did not deny the Application, Plaintiffs could have pursued a lawsuit for their failure to act, and because Defendants did deny the Application, they now are faced with a claim that their denial was unlawful. In any event, the FCC's language in its interpretation makes clear that local governments have a say in whether the Shot Clock should be extended—the declaratory

ruling states that "a 'reasonable period of time' may be extended beyond 90 or 150 days by *mutual consent* of the personal wireless service provider and the State or local government[.]" 24 F.C.C. Rcd. at 14013 (emphasis added). If the FCC intended for the extension of the deadline for review of an application to be entirely at the discretion of the applicant, as Plaintiffs appears to contend, it would have said so in the plain language of its declaratory ruling.

For the reasons discussed above, Defendants' motion as to the substantial evidence claims is granted.

### B.     Effective Prohibition

Plaintiffs claim that Defendants' actions and Defendants' zoning laws impose an unlawful prohibition on the provision of wireless services in violation of 47 U.S.C. § 332(C)(7)(B)(i)(II) based on (1) their denial of Plaintiffs' siting application, and (2) the fees charged for reviewing the application. The Court addresses each claim in turn.

### 1.     Denial of the Application

Plaintiffs contend the Application originally submitted to Defendants had all of the information necessary for Defendants to make a determination on the merits. (Dkt. 26-9 at 15-20). The Court finds Defendants' denial of the Application does not violate the effective prohibition provision of the TCA for the reasons that follow.

The Second Circuit has held that under the TCA, "local governments must allow service providers to fill gaps in the ability of wireless telephones" to connect to the national telephone network. *Willoth*, 176 F.3d at 643. The TCA provides that any local government "regulation of the placement, construction, and modification of personal wireless service

facilities . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). "[S]ubsection B(i)(II) only considers whether a town's decision will have the effect of prohibiting personal wireless services in a given area," *Willoth*, 176 F.3d at 640, and it "addresses the showing an applicant must make before TCA § 332(c)(7)(B)(i)(II) will *require* a planning board to grant its application," *Omnipoint*, 430 F.3d at 535. "[I]n determining whether an ordinance has the effect of prohibiting the provision of telecommunications services," the Second Circuit "consider[s] whether the ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." *TCG N.Y., Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002) (alteration in original) (quoting *In re Cal. Payphone Assoc.*, 12 FCC Rcd. 14191, 14206 (1997)); *see In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd. 9088, at ¶ 37 (2018) ("2018 FCC Ruling") ("An effective prohibition occurs where a state or local legal requirement materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service."), *stay denied*, 33 FCC Rcd. 11,750 (2018).

"A local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be closed by less intrusive means." *Willoth*, 176 F.3d at 643. In other words, "a plaintiff will prevail on an effective prohibition claim 'if it shows both that a significant gap exists in wireless coverage and that its proposed facility is the least intrusive means to close that gap.'" *Orange County-Poughkeepsie Ltd. P'ship v. Town of East*

*Fishkill*, 84 F. Supp. 3d 274, 296-97 (S.D.N.Y. 2015) (quoting *T-Mobile Ne. LLC v. Town of Ramapo*, 701 F. Supp. 2d 446, 456 (S.D.N.Y. 2009)).[6]

A reasonable trier of fact could not find on the record before the Court that Plaintiffs demonstrated the proposed facility is the least intrusive means to close the coverage gap. Cases within this Circuit that have found the denial of an application constituted an effective prohibition did so in circumstances where the town or zoning board received reports or analyses with detailed evaluations of alternative sites, took them into consideration when denying the application, and then proscribed conditions that were all but impossible to meet.[7] *See New Cingular Wireless PCS, LLC v. Town of Fenton*, 843 F.

---

[6]     Plaintiffs argue that the 2018 FCC Ruling overruled the Second Circuit's "significant gap/least intrusive means" standard. (Dkt. 26-9 at 16-17). Although the FCC's interpretations in the 2018 FCC Ruling are entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *see City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 301-05 (2013) (holding the FCC was entitled to *Chevron* deference when interpreting the terms of 47 U.S.C. § 332(c)(7)(B)), the 2018 FCC Ruling was issued in September 2018, after the events at issue, and there is a question of whether the 2018 FCC Ruling applies retroactively. Regardless, the 2018 FCC Ruling explicitly adopted the "material inhibition" standard used by the Second Circuit to determine whether a state or local law prohibits or effectively prohibits service within the meaning of the TCA. *See* 33 FCC Rcd. 9088, at ¶ 31 ("[W]e express our agreement with the views already stated by the First, Second, and Tenth Circuits that the 'materially inhibit' standard . . . is the appropriate standard[.]"). The 2018 FCC Ruling did reject the Second Circuit's position that a coverage gap is required for there to be an effective prohibition. *See id.* at ¶ 40 n.94. In other words, the 2018 FCC Ruling found that an effective prohibition can occur "*not only* when filling a coverage gap but also when . . . otherwise improving service capabilities." *Id.* at ¶ 37 (emphasis added). However, it is undisputed that the project at issue here addresses a coverage gap. (*See* Dkt. 6-1 at 54 ("[The] engineering team has determined that a service gap exists in Southport[.]")). Therefore, the 2018 FCC Ruling does not impact the Second Circuit's standard as to effective prohibition claims regarding coverage gaps, applicable here.

[7]     The case cited by Plaintiffs for the proposition that "[t]he law only requires a plaintiff to engage in a good faith effort to evaluate alternative sites" analyzed a substantial

Supp. 2d 236, 258 (N.D.N.Y. 2012) (holding the zoning board's denial of the variance amounted to an effective prohibition of service because it "left the plaintiff 'whipsawed,' in the untenable position of advocating [an] alternative, two-site solution to its coverage gap that is likely to generate considerable additional delay and then, ultimately fail"); *Town of LaGrange*, 658 F. Supp. 2d at 560 ("The [defendant's] denial of [the plaintiff]'s application has left [the plaintiff] with no feasible means of filling the gap, short of building a new tower that it cannot build under existing Town Law[.]"); *Nextel Partners, Inc. v. Town of Amherst, NY*, 251 F. Supp. 2d 1187, 1196 (W.D.N.Y. 2003) ("The Town's own telecommunications regulations unequivocally state a strong preference that wireless providers collocate antennae on existing structures and, in any event, the Town's adoption of a moratorium on any new towers has foreclosed that option. The moratorium, coupled with the [zoning board of appeals'] denial of [the plaintiff]'s collocation application, has left [the plaintiff] with no means of filling the significant coverage gap in the Town and clearly has the effect of prohibiting wireless service within the Town in violation of the TCA."). In other words, "[w]here the plaintiff's existing proposal is the only feasible plan to close the relevant coverage gap, it seems evident that no less intrusive means is possible, and the application must be granted." *Town of Ramapo*, 701 F. Supp. 2d at 457.

_____

evidence claim under § 332(c)(7)(B)(iii), not an effective prohibition claim pursuant to § 332(c)(7)(B)(i)(II). *See N.Y. SMSA Ltd. P'ship v. Town of Oyster Bay*, No. 11-CV-3077 (MKB), 2013 WL 4495183, at *17-18 (E.D.N.Y. Aug. 16, 2013) (quotation omitted). Plaintiffs have also brought a substantial evidence claim, addressed earlier in this Decision and Order.

In the instant matter, a reasonable trier of fact could not find on the record before the Court that Plaintiffs' initial Application demonstrated that their proposal was the only feasible plan. In the Application, Plaintiffs provided a cursory analysis of only three alternative sites, and one existing tower for potential co-location. (*See* Dkt. 6-1 at 57 ("An introductory visit to leave contact information did not result in any interest from this owner.")). After reviewing the Application, Defendants asked Plaintiffs to provide additional information, such as an assessment of alternative locations, evidence that Plaintiffs made attempts to co-locate on existing towers, and reasons that co-location on different towers was not feasible, which Plaintiffs agreed to do. (Dkt. 22-6 at ¶¶ 10, 12, 14). Plaintiffs did not submit the requested supplemental materials until June 1, 2018, nearly three weeks after the Shot Clock expired (*id.* at ¶ 42), and Defendants have made it clear that they will review a resubmitted application with the supplemental materials (Dkt. 6-3 at 153). A reasonable trier of fact could not find Defendants' willingness to review an application with supplemental materials that Plaintiffs agreed to provide rises to the level of an effective prohibition on the provision of wireless services. Accordingly, the Court grants Defendants' motion for summary judgment as to this claim.

## 2. Attorneys' and Consultants' Fees

Plaintiffs contend that Defendants' legal and consultant fees were unreasonable and placed a burden on Defendants that effectively prohibited service in violation of the TCA, and that the Town Zoning Laws allowing for such fees similarly effectively prohibited service. (Dkt. 26-9 at 23-27). On the current record, it is not clear whether the Court's granting of a declaratory judgment in favor of Plaintiffs on the claim that the ordinances at

issue are unlawful under New York State law has mooted Plaintiffs' TCA claims related to those same ordinances and fees charged. The Court notes that the standards for evaluating a TCA claim are not the same as a claim under New York law—for instance, unlike *Synagogue*'s holding, interpretations of the TCA do not require the costs to be necessary, only that they be reasonable. In any event, given the lack of clarity as to the continuing viability of the TCA effective prohibition claims based on the fees charged and authorized by the ordinances that have now been declared unlawful under New York law, the Court denies the summary judgment motion on this ground without prejudice, with leave to renew on or before November 29, 2019.

**IV.    CPLR Article 78 and Article 30 Claim**

Defendants also move for summary judgment as to Plaintiffs' state law claim that Defendants' denial of their Application violated CPLR Article 78 and Article 30 because it was arbitrary and capricious. (Dkt. 1 at 33-34; Dkt. 22). Although "Article 78 imposes its own requirement that local decisions be supported by substantial evidence" the test for relief from a zoning board's decision under Article 78 "'is essentially the same as that under the TCA.'" *Town of Ramapo*, 701 F. Supp. 2d at 461 (quotation omitted). Because the Court finds Defendants' denial was supported by substantial evidence under the TCA, it also finds that the denial is supported by substantial evidence under New York State law and grants Defendants' summary judgment motion as to this claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 22) is granted in part and denied in part. Specifically, the Court grants summary judgment in

favor of Plaintiffs as to the declaratory judgment claim that certain provisions of Southport's Town Zoning Law are unlawful under New York State law, and a declaratory judgment is hereby entered in favor of Plaintiffs and against Defendants that Southport's Town Zoning Law §§ 525-50, 525-65, and 525-143(B)(2) violate New York law as articulated in *Jewish Reconstructionist Synagogue of North Shore v. Incorporated Village of Roslyn Harbor*, 40 N.Y.2d 158 (1976), and that accordingly Plaintiffs are not liable to pay any fees by the Town's outside consultants and counsel pertaining to Plaintiffs' Application. The Court denies the summary judgment motion as directed to Plaintiffs' claim that the fees charged and the Zoning Law allowing for those charges effectively prohibited service in violation of the TCA without prejudice, with leave to renew on or before November 29, 2019. The Court otherwise grants summary judgment in favor of Defendants on the remaining claims.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: September 25, 2019
      Rochester, New York